**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| ROBERT REED, ) | |
| ) | CASE NO.   1:08-CV-3030 |
| Plaintiff, ) | |
| ) | |
| v. ) | MAGISTRATE JUDGE GREG WHITE |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security ) | **MEMORANDUM OPINION & ORDER** |
| ) | |
| Defendant. ) | |

Plaintiff Robert Reed ("Reed") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Reed's claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq*.  The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, this Court AFFIRMS the final decision of the Commissioner.

## I. Procedural History

On February 14, 2003, Reed filed an application for POD, DIB, and SSI alleging a disability onset date of September 6, 2001, claiming that he was disabled due to a combination of physical and mental impairments. His application was denied both initially and upon reconsideration. Reed timely requested an administrative hearing.

On June 5, 2006, an Administrative Law Judge ("ALJ") held a hearing during which Reed, represented by counsel, testified. Michael Klein testified as the vocational expert ("VE"). On December 12, 2006, the ALJ found Reed was able to perform a significant number of jobs in the national economy and, therefore, was not disabled. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

On appeal, Reed claims the ALJ erred by: (1) failing to accord appropriate weight to the findings and opinions of his treating and examining physicians; and (2) posing an incomplete hypothetical question to the VE.

## II. Evidence

*Personal and Vocational Evidence*

Born on May 11, 1958, and age forty-eight (48) at the time of his administrative hearing, Reed is a "younger" person under social security regulations. *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c). Reed has an eighth grade education and past relevant work as a casting machine operator.

*Medical Evidence*

1. *History of Mental Impairments*

On February 14, 2002, Reed underwent a diagnostic assessment performed at The Center

2

for Individuals and Family Services. (Tr. 177.) Arthur Duran, M.A., P.C., and Norma Mahaffy, LPCC diagnosed Reed as suffering from panic disorder with agoraphobia and a generalized anxiety disorder. (Tr. 177.) Reed was assigned a global assessment of functioning ("GAF") score of 50.[1] *Id.*

On April 4, 2002, Chandu Patel, M.D., diagnosed Reed with panic disorder, depressive disorder, alcohol abuse in remission, and cocaine abuse in remission. (Tr. 173.) Reed was assigned a GAF score of 65. *Id.*

On February 18, 2003, Dr. Patel noted that Mr. Reed's mental status examination was remarkable for his depressed mood, flat affect, psychomotor retardation, poverty of speech, social isolation, and some agoraphobia. (Tr. 169.) Reed denied current paranoia, hallucinations, or suicidal/homicidal ideation. *Id.*

On July 15, 2003, Reed was referred to William Schonberg, Ph.D., for a consultative psychological examination at the State Agency's request. (Tr. 179-186.) Dr. Schonberg diagnosed Reed with alcohol dependency in early sustained remission, cocaine abuse in early sustained remission, a dysthymic disorder, borderline intellectual functioning, and a personality disorder. (Tr. 183.) Testing demonstrated general memory in an extremely

---

[1] A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning. A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers. A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning. A person who scores in this range may have a depressed mood, mild insomnia, or occasional truancy, but is generally functioning pretty well and has some meaningful interpersonal relationships. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. revised, 2000).

low range and a reading comprehension score at the 4.9 grade level. *Id*. Psychometric test results yielded a Verbal IQ of 84, a Performance IQ of 75, and a Full Scale IQ of 78. (Tr. 182.) Dr. Schonberg assigned Reed a GAF score of 65 and opined that he was moderately limited in his ability to relate to others and withstand stress, but could perform simple, repetitive work. (Tr. 183.)

On July 29, 2003, Caroline Lewin, Ph.D., a non-examining Social Security psychologist, completed a mental RFC assessment. (Tr. 224-226.) Dr. Lewin found that Reed had moderate limitations in the following areas: his ability to maintain attention and concentration for extended periods; his ability to work in coordination with or in proximity to others without being distracted; his ability to interact appropriately with the general public, his ability to ask simple questions or request assistance; his ability to accept instructions and respond appropriately to criticism from supervisors; his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and in his ability to respond appropriately to changes in the work setting. (Tr. 224-225.) Dr. Lewin also completed a Psychiatric Review Technique and indicated that Reed has moderate difficulty in maintaining social functioning, concentration, persistence, and/or pace. (Tr. 233.)

On November 19, 2004, Reed was referred to Aaron Becker, Psy.D., for a mental RFC assessment by the Richland County Department of Jobs and Family Services. (Tr. 261-265.) Reed was diagnosed with bipolar I disorder, most recent episode depressed, in partial remission, and was assessed as having borderline intellectual functioning. (Tr. 264.) Becker opined that Reed's psychological symptoms would effectively impair his ability to obtain and maintain gainful employment. Nonetheless, Becker believed that, with appropriate psychological

4

treatment, Reed should be able to return to work in nine to eleven months. (Tr. 264-265.) Reed was assigned a GAF score of 62. *Id*. Becker also completed a Mental Functional Capacity Assessment form and indicated that Reed was markedly limited in completing a normal workday and work week without interruptions from psychologically based symptoms. (Tr. 266.)

2.  *History of Physical Impairments*

On October 8, 1999, an MRI of Reed's lumbar spine revealed bilateral facet arthropathy at the L3-L4 level, mild broad base posterior disc bulge with hypertrophic facet arthropathy causing borderline spinal stenosis at the L4-L5 level, and bilateral facet arthropathy with a small central/right paracentral posterior disc bulge which abuts and slightly displaces the right S1 nerve root in the lateral recess at the L5-S1 level. (Tr. 151.)

On September 3, 1999, a cervical MRI showed the following: (1) mild narrowing of the C6-7 intervertebral disc space with a moderately large right paracentral disc protrusion which touches and displaces the right side of the adjacent cervical spinal cord and probably impinges upon the right neural foramen; and, (2) a small central left paracentral disc protrusion at the C3-4 level. (Tr. 156.)

On January 22, 2002, the small right paracentral disc protrusion at the L5-S1 level was confirmed by a new MRI. (Tr. 152.)

On December 19, 2002, Reed began pain management treatment with James Wolfe, M.D. and received an epidural block. (Tr. 191-92.) Dr. Wolfe diagnosed L4-5/ L5-S1 degenerative disc disease and bilateral lumbar sensory radiculitis. *Id*.

On February 27, 2003, Reed presented at the ER with an injured right leg after slipping on ice the previous day. (Tr. 154.) An x-ray revealed a right knee sprain and right distal fibular

5

fractures, one acute and one chronic. (Tr. 155.)

On June 23, 2003, E.S. Villanueva, M.D., reviewed Reed's medical records at the request of the State Agency. (Tr. 161-65.) He opined that Reed could lift/carry ten pounds frequently and twenty pounds occasionally, as well as stand/walk for six hours in an eight-hour workday – limitations consistent with an RFC for light work activity. *Id*. He found no evidence of manipulative, visual, communicative, or environmental limitations, but indicated Reed could never climb ladders, ropes, or scaffolds. *Id*.

On July 16, 2003, Dr. Wolfe performed a diagnostic lumbar diskograph, which revealed moderately degenerated discs at L3-4 and L4-5 and a mild to moderate L5-S1 degenerated disc that was bulging to the right. (Tr. 187-88.) He opined, however, that discogenic pain is not the source of Reed's complaints. (Tr. 188.)

On August 6, 2003, Reed underwent an elective L4-5 percutaneous disc decompression procedure performed by Dr. Wolfe after persistent complaints of back and leg pain. (Tr. 208-09.) On September 15, 2003, Dr. Wolfe noted that Reed's back symptoms had improved substantially since the procedure. (Tr. 207.) He reported some "occasional leg ache" with steady improvement. *Id*.

On June 3, 2004, Reed was evaluated by Mei-Chiew Lai, M.D., at the request of Richland County Job and Family Services. (Tr. 244-248.) Dr. Lai's impression was recorded as follows: (1) post- traumatic chronic neck pain and low back pain; (2) rule out a discogenic disorder and/or radiculopathy of the cervical and/or of the lumbosacral spine; (3) depression and anxiety; (4) ganglion cyst at the right dorsal hand; and, (5) rule out the possibility of peripheral neuropathy. (Tr. 247.) Dr. Lai opined that Reed was employable part-time (*i.e.* five to six hours

6

daily, five days a week), but with the restrictions of sitting, standing, and walking alternately. *Id*. Dr. Lai also discouraged repetitive bending or lifting anything beyond an occasional twenty pounds from the floor. *Id*. Dr. Lai questioned whether Reed could face the work environment given his depression and anxiety. *Id*. It was recommended that the opinion of a psychologist be obtained. *Id*. On the same date, Dr. Lai completed a physical functional capacity assessment indicating that Reed's restrictions would last between thirty days and nine months. (Tr. 250.)

On November 17, 2004, Reed underwent extensive EMG and NCV studies performed by Dr. Lai. (Tr. 235.) The tests revealed a mild degree of right lower lumbar and upper sacral nerve root irritation, involving the posterior primary rami, probably at the right L5, S1 nerve root level. (Tr. 235, 238-39.) Dr. Lai opined that Reed most likely could not return to work until he received appropriate management to control his pain symptoms and depression. (Tr. 235.)

On June 6, 2005, Siraj Siddiqui, M.D., Reed's treating internist, submitted a functional capacity assessment stating that Reed was unemployable for twelve months or more. (Tr. 310.) Dr. Siddiqui also reported that Reed could stand/walk and sit four hours each out of an eight-hour work day, could lift six to ten pounds frequently, and was moderately limited in pushing, pulling, bending, reaching and repetitive foot movements. *Id*.

### *Hearing Testimony*

Reed testified that his pain is most severe in his lower back, which he rated as a 7 on a 10 point scale. (Tr. 322.) Reed stated that he attempts to relieve his pain by lying flat on the floor, taking medication, and using a heating pad. *Id*. He also discussed his psychiatric symptoms, but explained that he can no longer afford counseling (Tr. 325-26.)

The ALJ asked the VE to consider a hypothetical individual with Reed's vocational

7

profile, but who could lift and/or carry only ten pounds frequently and twenty pounds occasionally, who could sit, stand or walk for six hours each in an eight-hour work day, who could frequently stoop, kneel, crouch, crawl and climb stairs, and who could never climb ladders, ropes or scaffolds. (Tr. 331-32.) The hypothetical individual was also limited to unskilled work, prohibited to have any contact with the general public, and only superficial contact with supervisors and co-workers. *Id.* Further, work settings were limited to those in which there are no high production standards and few, if any, rigid deadlines. *I*d. In response, the VE testified that none of Reed's skills from previous employment would transfer. (Tr. 332-33.) He further testified that approximately fifty percent of the sedentary and light work base would remain in light of the individual's physical limitations, but only about one-third would remain when also considering the non-exertional limitations. *Id.* He identified jobs such as hand packing, inspection, and surveillance system monitor that an individual with the above limitations could perform. *Id.*

Reed's counsel asked the VE to reduce the hypothetical individual's standing/walking ability to four hours in a work day with the additional limitation of being able to stand/walk and sit for only thirty minutes at a time. (Tr. 333.) The VE stated that light work would be precluded because of the standing limit, and sedentary work would be precluded because of the sitting limit. *Id.* Therefore, he opined, such person would not have the ability to work an eight-hour day on a consistent basis. (Tr. 333-34.)

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason

8

of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[2]

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Reed was insured on his alleged disability onset date, September 6, 2001, and remained insured through the date of the ALJ's decision, December 31, 2006.  (Tr. 17.)  Therefore, in order to be entitled to POD and DIB, Reed must establish a continuous twelve month period of disability between those dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

A claimant may also be entitled to receive SSI benefits under the Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must also meet certain

---

[2]  The entire five-step process entails the following: First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

## IV.  Summary of Commissioner's Decision

The ALJ found Reed established medically determinable, severe impairments due to degenerative disc disease of the lumbar and cervical spines, hepatitis C, status-post tibia fracture, dysthymia, borderline intellectual functioning, personality disorder, gastroesophageal reflux disease, and substance abuse.  However, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Reed is unable to perform his past work activities, but has a Residual Functional Capacity ("RFC") for a limited range of light work.  The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and the VE testimony to determine that Reed is not disabled.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

**VI. Analysis**

Reed claims the ALJ erred by: (1) failing to accord appropriate weight to the findings and opinions of his treating and examining physicians; and (2) posing an incomplete hypothetical question to the VE. Each will be discussed in turn.

*Treating and Examining Physicians*

Reed argues that the ALJ's RFC finding is not supported by substantial evidence because the ALJ failed to give appropriate weight to the opinions of his treating physicians. (Pl.'s Br. at 12-15.) Specifically, Reed argues that the ALJ should have afforded greater weight to the opinions of Dr. Lai, Dr. Siddiqui and psychologist Becker than to the opinion of a non-examining physician. *Id*. Reed also asserts that the ALJ failed to mention Dr. Wolfe. *Id*.

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 2009 U.S. App. LEXIS 21132 at *22 (6th Cir. Sept. 24, 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 F. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and

11

416.927." *Blakley*, 2009 U.S. App. LEXIS 21132 at *22.[3]

Nonetheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 2009 U.S. App. LEXIS 21132 at *16 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent the with other substantial evidence in the case record.") (*quoting* SSR 96-2p). Moreover, the ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject determinations of such a physician when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir.1984). According to 20 C.F.R. § 404.1527(e)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final

---

[3] Pursuant to 20 C.F.R. § 404.1527(d), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855;  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

First, Reed's contention that the ALJ never mentions Dr. Wolfe is not altogether accurate.  While the ALJ's opinion does not refer to Dr. Wolfe by name, he does discuss the medical findings in Exhibits 7F and 9F, which constitute Dr. Wolfe's treatment notes.  (Tr. 18.) Moreover, these notes primarily contain diagnostic findings which the ALJ included in his findings regarding Reed's severe impairments.  Reed has not drawn the Court's attention to any opinion by Dr. Wolfe that discusses the limiting effects caused by Reed's various impairments.

With respect to Dr. Lai, Dr. Siddiqui, and psychologist Becker[4], the ALJ found that "[t]o the degree that [their] statements are meant to be work-preclusive, the lack of persistent objective findings to support such conclusions are not present."  (Tr. 24.)  As such, the ALJ ascribed little weight to their opinions.  *Id*.  With respect to Dr. Siddiqui's opinion specifically, the ALJ expressly stated that "[t]here are no objective findings to support the restrictions concerning lifting, carrying, pushing, pulling, bending, and reaching ... and [he] provided no such findings or rationale."  (Tr. 24.)  This analysis, though brief, adequately applied the procedures in 20 C.F.R. § 404.1527(d).  The ALJ, by finding that the aforementioned opinions were not supported by objective medical evidence, clearly was addressing the "supportability" of the opinions as set forth in 20 C.F.R. § 404.1527(d)(3).[5]  Therefore, because the ALJ found that

---

[4] Becker is not a treating source, but rather examined Reed at the request of the Richland County Department of Jobs and Family Services.  (Tr. 261-65.)

[5] 20 C.F.R. § 404.1527(d)(3) explains that: "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion.  Furthermore, because nonexamining sources have

these opinions were not based on sufficient medical data, he did not err by discounting them. Reed makes no attempt to demonstrate that the aforementioned doctors' opinions were indeed supported by objective medical evidence thereby rendering the ALJ's opinion unreasonable. The ALJ gave great weight to the opinion of Dr. Schonberg, who performed a psychological evaluation of Reed and tested his mental functioning. Dr. Schonberg's findings, by contrast, were deemed consistent with those of State Agency reviewing psychologists. (Tr. 24, 179-86.) There is nothing procedurally improper about giving greater weight to the opinion of an examining, or even non-examining, physician than that of a treating physician where the ALJ has discounted a treating physician's opinion as unsupported by objective medical evidence.

    The ALJ further noted that in Dr. Lai's opinion Reed would be unable to work for thirty days to eleven months, while Becker felt that he could not work for a period between nine to eleven months. (Tr. 24.) Even if credited, the ALJ reasoned, such a period fails to satisfy the twelve month requirement before disability benefits will be awarded. *Id*. While Dr. Siddiqui did opine that Reed was unemployable for twelve months or more, the ALJ reiterated that no objective findings supported the physical restrictions imposed by him. *Id*. Nonetheless, a medical source's conclusion that Reed is "unemployable" does not constitute a medical opinion, and, therefore, is not entitled to any special weight. An opinion that a claimant is disabled is an issue expressly reserved for the Commissioner and does not constitute a medical opinion. 20 C.F.R. § 404.1527(e). An ALJ need not give any weight to a conclusory statement of a treating

---

no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources."

physician that a claimant is disabled, and may reject determinations of such a physician when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Sec' of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir.1984). "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled," as it is the Commissioner who must make the final decision on the ultimate issue of whether an individual is able to work. *See* 20 C.F.R. § 404.1527(e)(1); *Duncan*, 801 F.2d at 855; *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

For the foregoing reasons, Reed's first assignment of error is without merit.

*Hypothetical*

Reed also argues that, because the ALJ improperly rejected the opinions of Dr. Lai, Dr. Siddiqui, and psychologist Becker, the hypothetical posed to the VE was inaccurate.

A hypothetical question must precisely and comprehensively set out every physical and mental impairment of the applicant that the ALJ accepts as true and significant. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the hypothetical question is supported by the evidence in the record, it need not reflect unsubstantiated allegations by claimant. *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990). A hypothetical question is not erroneous where at least one doctor substantiates the information contained in the question. *See Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 927-928 (6th Cir. 1987) (per curiam).

Reed's argument, however, is contingent upon the success of his first claim. As

discussed above, the ALJ did not err by ascribing little weight to the opinions of certain medical sources concerning Reed's ability to work or their assessment of his limitations. Reed cites no authority for the proposition that a medical source's opinion – even where appropriately rejected by the ALJ – must, nonetheless, be incorporated in the hypothetical. Indeed, such a requirement would yield absurdly contradictory results. Thus, the ALJ did not err by failing to include in his hypothetical unsubstantiated or unexplained limitations.

As the ALJ's hypothetical adequately set out those physical and mental impairments that the ALJ accepted as true and significant, Reed's second assignment of error is without merit.

## VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence. Accordingly, the decision of the Commissioner is AFFIRMED and judgment is entered in favor of the defendant.

IT IS SO ORDERED.

<u>s/ Greg White</u>
U.S. Magistrate Judge

Date: <u>October 27, 2009</u>